Central Savings Bank in the City of New York and Others, Plaintiffs, *v.* The City of New York and Others, Defendants.

First Department, June 24, 1938.

*Jesse Knight* of counsel [*John H. Willenbrok, Kenneth N. LaVine* and *Robert C. Fulton, Jr.,* with him on the brief; *Curtis, Mallet-Prevost, Colt & Mosle,* attorneys for Central Savings Bank in the City of New York; *Edwin A. Berkery* with him on the brief; *Joseph H. Praetz,* attorney for The Emigrant Industrial Savings Bank], for the plaintiffs.

*William I. Hart* of counsel [*Joseph R. Truesdale,* attorney], for the plaintiffs Dry Dock Savings Institution and Fannie Messer.

*William S. Gaud, Jr.,* of counsel [*William C. Chanler, Corporation Counsel,* attorney], for the defendants.

GLENNON, J. This submission is designed to test the constitutionality of chapter 353 of the Laws of 1937, amending section 309 of the Multiple Dwelling Law. The amendment is known as the " Murray Prior Lien Law." It authorizes the city to make certain repairs upon old-law tenements and assess the cost as a lien prior to existing mortgages and other incumbrances upon the properties improved.

Each of the three plaintiff banks is the owner of a mortgage on one of the three premises involved in this proceeding. These mortgages antedate the enactment of the Prior Lien Law. The plaintiff Fannie Messer is the owner in fee of one of the premises.

The owners of the two other parcels involved have requested the department of housing and buildings to make necessary repairs to their buildings pursuant to its order.

The moneys to be used for defraying expenses incurred in the execution of orders are to be obtained pursuant to the provisions of section 309, subdivision 6, of the Multiple Dwelling Law from a revolving fund to be known and designated by the term, " Old-Law Tenement Assessment Fund." Provision is made as to the manner in which this fund may be created and established.

In the event that the fund is established, the moneys therein may be used to defray the expenses in the execution of orders issued under this section affecting old-law tenements. " Such expenses shall be deemed to mean the cost and expense of making improvements pursuant to such orders." The act further provides, in part, that the board of assessors shall, upon the certificate and affidavit of the department charged with the enforcement of this chapter, " assess the amount of such expenses against the property upon and with respect to which the work was performed." If the board confirms the assessment, the city shall have " a lien or charge upon the property or premises in respect to which the same may have been made, which lien shall have priority over all other liens and encumbrances, including mortgages, whether or not recorded previously to the levying of such assessment, except that the lien of such assessment shall not have priority over taxes and assessments for other public or local improvements levied pursuant to law." It is further provided that the department of housing and buildings shall have the powers conferred therein up to and including December 31, 1939, " but the termination of such powers shall not terminate the lien created by sub-paragraph (g) hereof."

The sole question submitted is whether section 309 of the Multiple Dwelling Law, as amended by chapter 353 of the Laws of 1937, is constitutional within the limitations of the Constitutions of the United States and of the State of New York.

It may be interesting to note the facts which led the Legislature to enact the provisions of the Multiple Dwelling Law now under attack. The underlying reasons are concisely stated under the topic " Declaration of Emergency " in section 1 of chapter 353: " It is hereby declared that the continued existence of many old-law tenement houses in an insanitary, unsafe and improperly ventilated condition, the continued failure on the part of many owners of old-law tenement houses to comply with the provisions of the multiple dwelling law and the vacation of such tenement houses due to such failure has resulted in a shortgage of sanitary, safe and properly ventilated dwellings for low income groups as found in

the report of the New York city housing authority after investigation, constitute a menace to the health, safety, morals, welfare and reasonable comfort to the citizens of the State, and that the establishment and maintenance of proper housing standards requiring sufficient light, air, sanitation and protection from fire hazards are essential to the public welfare, that the provisions in this act contained are enacted and their necessity in the public interest is hereby declared to be a matter of legislative determination."

The New York city housing authority was empowered by the statute under which it was established to investigate into the living and housing conditions, and hold hearings. On December 15, 1936, the mayor of the city of New York held a public meeting for the purpose of determining ways and means of helping an incipient housing crisis affecting the owners and tenants in old-law tenements. It appeared that many owners, forced to comply with the recent requirements of the Multiple Dwelling Law, decided to vacate their buildings instead. Tenants in the so-called low income class found difficulty in locating other apartments.

Mindful of the emergency, the housing authority commenced public hearings two days later. Between December 17 and December 30, 1936, a great many witnesses appeared and gave testimony. The investigation proved beyond peradventure of a doubt that a real menace to the health, safety, morals, welfare and comfort of a large body of citizens existed. The report of the authority shows that there were 64,829 old-law tenements in the city, which house at least 2,000,000 people. On that date, 50,441 buildings of that type had violations pending against them. In 1936 there were 513,047 old-law tenement apartments and 907,554 new-law. The death rate from all causes was ninety-three per cent higher in the old-law tenements; from tuberculosis one hundred and twenty-nine per cent higher; from spinal meningitis one hundred and nineteen per cent higher; from diphtheria ninety-seven per cent higher, and from typhoid fever fifty-five per cent higher. As of December 15, 1936, 144,274 families were receiving rent payments from the emergency relief bureau. The total rent allotment alone for 1935 was $31,866,640. It was estimated about thirty per cent of the tenants living in old-law tenements were on relief. There were very few apartments available where people, not fortunate enough to receive a decent income, could afford to live.

With these figures before it, the Legislature in its wisdom deemed it advisable to enact the law which the plaintiffs assert is unconstitutional. With this contention we do not agree. While the provisions of the act, as amended, may work a hardship on some

property owners and mortgagees, still we must look to the best interests of the citizenry of the State rather than the individual. The thought was well expressed by Fire Commissioner McElligott when he stated before the authority: " Financial conditions may have prohibited complying with the law, but you cannot match financial conditions with life if you want to protect the lives of the poor people who are compelled to reside in old-law tenements."

If more were needed, we may quote the words of Judge CROUCH in *Matter of New York City Housing Authority* v. *Muller* (270 N. Y. 333): " The menace of the slums in New York city has been long recognized as serious enough to warrant public action. The Session Laws for nearly seventy years past are sprinkled with acts applying the taxing power and the police power in attempts to cure or check it. The slums still stand. The menace still exists."

Little if any heed need be given to the cry that the act is unconstitutional upon the theory that it impairs the obligations of mortgage contracts. The fact of the matter is that the mortgagee in the long run will benefit by having the property, which is the security for the debt, improved in such a way that it will be no longer a menace to human life. The owner who desires to comply with the provisions of the act but who has no means to do so is given the opportunity by the city to have necessary repairs made without the outlay by him of the initial cost.

The constitutionality of the act as it existed immediately prior to the time the amendments now under attack were enacted was upheld in *Adamec* v. *Post* (273 N. Y. 250). In that case Judge LEHMAN said in part: " The imposition of the cost of the required alterations as a condition of the continued use of antiquated buildings for multiple dwellings may cause hardship to the plaintiff and other owners of ' old law tenements ' but, in proper case, the Legislature has the power to enact provisions reasonably calculated to promote the common good even though the result be hardship to the individual. ' It is not the hardship of the individual case that determines the question, but rather the general scope and effect of the legislation as an exercise of the police power in protecting health and promoting the welfare of the community at large. It is a well-recognized principle in the decisions of the State and Federal courts that the citizen holds his property subject not only to the exercise of the right of eminent domain by the State, but also subject to the lawful exercise of the police power by the Legislature; in the one case property is taken by condemnation and due compensation; in the other the necessary and reasonable expenses and loss of property in making reasonable changes in existing

structures, or in erecting additions thereto, are *damnum absque injuria.*' "

The city in the exercise of its police power may impair the security of a mortgagee by compelling an owner to vacate an old-law tenement. (*Adamec* v. *Post, supra.*) In discussing the general subject of police power, Mr. Justice BROWN, in *Lawton* v. *Steele* (152 U. S. 133), said in part: " It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power it has been held that the State may order the destruction of a house falling to decay or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public conveyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane or those afflicted with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; the suppression of obscene publications and houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold. Beyond this, however, the State may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the Legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests."

If the reasoning employed by the United States Supreme Court and our Court of Appeals is sound, it is fair to say that the giving of a prior lien to the city for the cost of removing a nuisance is a valid exercise of police power.

Objection is made to the amendments upon the theory that the city is permitted to establish a revolving fund of public moneys to defray the expense of making repairs. Before this statute was enacted the city had the right to use the taxpayers' money for the purpose of demolishing buildings which were unsafe. Here the fund is set up for the purpose of enabling the city to eradicate a condition which is determental to the health of the community, a real city purpose within the meaning of article 8, section 10, of the Constitution. Incidentally, the city in all probability will be reimbursed fully for the expenditures which it makes. While the expenditure of the city's funds in the first instance may result in a benefit to individual property owners, still we must not lose

sight of the fact that the statute is designed to benefit the public at large.

It is conceded, at least by one of the plaintiffs, that if the lien created by the Murray Prior Lien Law for the expense of making the repairs and alterations necessary under paragraph 8 of the stipulation were a valid exercise of the State's taxing power, the lien would be entitled to priority over pre-existing mortgages.

We believe the act to be a proper exercise of the State's taxing power. It has for its purpose the abatement of nuisances in old-law tenements. It limits the amount of assessments to the cost and expense of making improvements; assessments are to be made by the board of assessors upon a certificate of the department of housing and buildings and an affidavit of that department as to the manner in which the costs were incurred and their amount. The assessments and the levying of liens therefor are governed by the provisions of the law covering generally other local improvements. The area of benefit in each case is the property improved. (*Genet* v. *City of Brooklyn,* 99 N. Y. 296; *People ex rel. Commissioners* v. *Banks,* 67 id. 568.)

Since we are of the opinion that the act is valid in all respects, judgment should be rendered in favor of the defendants, without costs.

MARTIN, P. J., COHN and CALLAHAN, JJ., concur; DORE, J., concurs in result.

Judgment unanimously directed in favor of the defendants, without costs. Settle order on notice.